**FILED**

FEB 1 8 2004

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**DOCKETED**

FEB 1 9 2004

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| KENNETH MOZINGO, individually and on behalf of all others similarly situated, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) ) |
| CONRAD N. BLACK, HOLLINGER INTERNATIONAL, INC., HOLLINGER INC., RAVELSTON CORPORATION LIMITED, RAVELSTON MANAGEMENT INC., ARGUS CORPORATION LTD., DWAYNE O. ANDREAS, PETER Y. ATKINSON, BARBARA A. BLACK, JACK A. BOULTBEE, RICHARD R. BURT, RICHARD G. CHAMBERS, DANIEL W. COLSON, MARK S. KIPNIS, HENRY A. KISSINGER, MARIE-JOSEE KRAVIS, SHMUEL MEITAR, GORDON A. PARIS, RICHARD N. PERLE, F. DAVID RADLER, GRAHAM W. SAVAGE, RAYMOND G. H. SEITZ, ROBERT S. STRAUSS, A. ALFRED TAUBMAN, JAMES R. THOMPSON, LORD WEIDENFELD, LESILE H. WEXNER, and KPMG LLP, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

No. **04C 1276**

**JUDGE MANNING**

**MAGISTRATE JUDGE KEYS**

*Jury Trial Demanded*

## CLASS ACTION COMPLAINT

Plaintiff, Kenneth Mozingo ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Hollinger International, Inc. securities analysts' reports and advisories about the Company, and information

readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal class action on behalf of purchasers of the publicly traded securities of Hollinger International, Inc. between August 13, 1999 and March 31, 2003, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      This action involves misstatements by defendant Hollinger International, Inc. ("Hollinger International" or the "Company"), a U.S. corporation based in Chicago, Illinois, regarding certain unauthorized transfers of assets of at least $32 million to corporate insiders and related entities. As a result, these transfers improperly and unfairly benefited these corporate insiders and related entities to the detriment of other shareholders of Hollinger International. Specifically, these transfers of assets involved non-competition payments in connection with the sale of Hollinger International assets from at least 1999 to at least 2001.

3.      In addition, defendant Hollinger International's board of directors, after allegations were raised by shareholders of unauthorized transfers of corporate assets, established a Special Committee of independent directors to investigate possible misconduct, to recover misappropriated assets and to protect the interest of Hollinger International shareholders. However, there have been growing indications that some of the very same Hollinger International corporate insiders and related entities who improperly received corporate assets are attempting to thwart and obstruct the efforts of the Special Committee. As a result, Plaintiff is seeking certain interim remedies in order to protect the interest of Hollinger International shareholders.

-2-

## JURISDICTION AND VENUE

4.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

5.      This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. § 1331.

6.      Venue is proper in this Judicial District pursuant to §27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b). Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this Judicial District. Additionally, the Company maintains a principal executive office in this Judicial District.

7.      In connection with the acts, conduct and other wrongs alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

*Plaintiff*

8.      Kenneth Mozingo bought shares of Hollinger during the Class Period and has suffered damages as a result of the wrongful acts of defendants as alleged herein.

*Defendants*

9.      Hollinger is a Delaware Corporation with its primary place of business at 401 North Wabash Avenue, Suite 740, Chicago, Illinois 60611.

10.     Hollinger International Inc. is controlled by its parent company, Hollinger Inc., a Canadian corporation which owns 30.3% of Hollinger International's shares. Lord Black controls Hollinger Inc. through Ravelston, Lord Black's private holding company, which directly and indirectly through its subsidiaries, controls approximately 78% of the shares of Hollinger Inc. Ravelston's subsidiaries include Ravelston Management Inc., Argus Corporation Ltd. ("Argus"), Moffat Management and Black-Amiel Management.

11.     Hollinger, Inc. is a Canadian corporation with its principal office located in Toronto, Canada.

12.     Ravelston Corporation Limited is an Ontario, Canada corporation with its principal office located in Toronto, Canada.

13.     Ravelston Management Inc. ("RMI") is a Canadian corporation with its principal office located in Toronto, Canada. RMI is a wholly owned subsidiary of Ravelston. Ravelston and RMI are hereinafter referred to collectively herein as "Ravelston."

14.     Argus Corporation Ltd. is a public Canadian corporation whose major investment is a 62% interest in the retractable shares of Hollinger Inc. and whose parent is Ravelston.

15.     Lord Conrad N. Black of Crossharbour ("Lord Black") is Chairman of the Board and until November 19, 2003 was Chief Executive Officer of Hollinger International. He remains CEO of Hollinger Inc. and Argus Corporation Ltd. Lord Black has held these positions since 1978. Lord Black owns, through Conrad Black Capital Corporation) 65.1% of Ravelston and therefore controls Ravelston and Hollinger Inc.

16.     Dwayne O. Andreas ("Andreas") was a member of the Board from February 1996 until his resignation in May 2002.

-4-

17.     Peter Y. Atkinson ("Atkinson") is Executive Vice President of the Company and was a member of the Board from early 2002 until his resignation in November 2003.

18.     Barbara Amiel Back ("Lady Black") is the Vice President, Editorial of Hollinger and a member of the Board.

19.     Jack A. Boultbee ("Boultbee") was an Executive Vice President of the Company from 1996 until his termination in November 2003. He was a member of the Board from 1990 to 2001. In addition, he served as Chief Financial Officer from 1995 to 1999. Boultbee is an owner of Ravelston.

20.     Richard R. Burt ("Burt") has been a member of the Board since September 1994 and was on the Board's audit and compensation committees during the period in question.

21.     Richard G. Chambers ("Chambers") was a member of the Board from February 1996 until his resignation in May 2002.

22.     Daniel W. Colson ("Colson") is Vice Chairman and a Director of the Company and Deputy Chairman, Chief Executive Officer and Director of The Telegraph, an affiliated Company of which Lord Black if the Chairman. Colson is also Chairman and a Director of Hollinger Telegraph New Media Ltd., Vice Chairman and Director of Hollinger Digital Inc., Vice Chairman and a Director of Hollinger Inc., and a Director of Argus.

23.     Mark S. Kipnis ("Kipnis") is an attorney who serves as Vice President, Corporate Counsel, and Secretary of Hollinger.

24.     Dr. Henry A. Kissinger ("Kissinger") has been a member of the Board since February 1996. The Wall Street Journal recently reported that Hollinger had given $200,000 a year to the National Interest, a conservative publication that includes Kissinger and Lord Black as advisors.

25.     Marie-Josee Kravis, O.C. ("Kravis") was a member of the Board from February 1996 until October 2003 and was on the Board's audit committee during the Class Period.

26.     Shmuel Meiter ("Meiter") has been a member of the Board since February 1996.

27.     Gordon A. Paris ("Paris") was named interim President and Chief Executive Officer of the Company in mid-November 2003 and has been a member of the Board since May 2003.

28.     Richard N. Perle ("Perle") has been a member of the Board since June 1994.

29.     F. David Radler ("Radler") was Deputy Chairman, President, Chief Operating Officer and a member of the Board of Hollinger until his November 2003 resignation.

30.     Graham W. Savage ("Savage") was elected to the Board on July 24, 2003 and serves on the Special Committee.

31.     Raymond G. H. Seitz ("Seitz") was elected to Board on July 24, 2003. He is the chairman of the Executive Committee and also serves on the Special Committee of the Board.

32.     Robert S. Strauss ("Strauss") was a member of the Board from February 1996 until his resignation in May 2002.

33.     A. Alfred Taubman ("Taubman") was a member of the Board from February 1996 until his resignation in May 2002.

34.     James R. Thompson ("Thompson") has been a member of the Board since June 1994 and was the chairman of the Board's Audit Committee and sat on the Compensation Committee during the Class Period.

35.     Lord Weidenfeld of Chelsea ("Weidenfeld") was a member of the Board from February 1996 until his resignation in May 2002.

36.     Leslie H. Wexner ("Wexner") was a member of the Board from February 1996 until his resignation in May 2002.

37.     KPMG LLP ("KPMG") is a "Big Four" accounting firm.  At all relevant times, KPMG was Hollinger's independent auditor.

38.     Lord Black, Andreas, Atkinson, Lady Black, Boultbee, Burt, Chambers, Colson, Kissinger, Kravis, Meitar, Paris, Perle, Radler, Savage, Seitz, Strauss, Taubman, Thompson, Weidenfeld, and Wexner are collectively referred to hereinafter as the "Individual Defendants."

39.     During the Class Period, each of the Individual Defendants, as senior executive officers and/or directors of Hollinger were privy to non-public information concerning its business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

40.     Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

-7-

41.     It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above. Each of the above officers of Hollinger International, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein. Said defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

42.     As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the New York Stock Exchange ("NYSE"), and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate prompt, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

-8-

43.     The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with Hollinger International, each of the Individual Defendants had access to the adverse undisclosed information about Hollinger International's financial condition and performance as particularized herein and knew or recklessly disregarded that these adverse facts rendered the positive representations made by or about Hollinger International and its business issued or adopted by the Company materially false and misleading.

44.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

45.     Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Hollinger International securities by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (1) deceived the investing public regarding Hollinger International's business, operations, management and the intrinsic value of Hollinger International's publicly traded

-9-

securities; and (2) caused Plaintiff and other members of the Class to purchase Hollinger International's publicly traded securities at artificially inflated prices.

## CLASS ACTION ALLEGATIONS

46.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the publicly traded securities of Hollinger between August 13, 1999 and March 31, 2003, inclusive, (the "Class Period") and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

47.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.

48.     Plaintiff's claims are typical of the claims of the members of the Class, because plaintiffs and all of the Class members sustained damages arising out of defendants' wrongful conduct complained of herein.

49.     Plaintiff will fairly and adequately protect the interests of the Class members and has retained counsel who are experienced and competent in class actions and securities litigation.

50.     A Class Action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable. Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and

burden of individual litigation make it impossible for the members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

51.     Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members, in that defendants have acted on grounds generally applicable to the entire Class. Among the questions of law and fact common to the Class are:

(a)     Whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     Whether Defendants breached their fiduciary duties by engaging in fraudulent activity; and

(c)     Whether the members of the Class have sustained damages and, if so, what is the appropriate measure of damages.

## SUBSTANTIVE ALLEGATIONS

52.     Hollinger International is a publisher of English-language newspapers in the United States, the United Kingdom and Israel, with a smaller presence in Canada. The Company's 23 paid daily newspapers have a worldwide combined circulation of approximately two million.

53.     In addition, the Company owns, or has interests in, over 250 other publications, including non-daily newspapers and magazines. Included among the Company's 144 paid newspapers are: Chicago Group's Chicago Sun-Times, the U.K. Newspaper Group's The Daily Telegraph and the Community Group's Jerusalem Post.

54.     From at least 1999 and continuing through at least 2001, Hollinger International has failed to disclose material information in required filings with the Commission as necessary to make the required statements, in the light of the circumstances, not misleading in connection with certain transfers of assets.

55.     In addition, in order to cause some of the transfers, Hollinger International personnel falsified corporate books and records. For example, in or about February 2001, certain books and records were altered in order to mischaracterize certain payments as non-competition payments.

56.     Hollinger International also failed to have adequate internal controls in order to insure that payments were properly approved before they were made and that public filings were accurate.

## A.     ASSETS SALES TO AFFILIATED ENTITIES

### 1.     *Horizon Publications, Inc.*

57.     In or about 1999, Hollinger International completed a transaction that involved the sale of assets to Horizon Publications, Inc. ("Horizon transaction"), which is owned and controlled by defendants Lord Black and Radler. The sale was disclosed in the 1999 annual filing on Form 10-K for Hollinger. The Company described its pending sale of assets to Horizon Publications Inc. as follows: "During the second quarter 1999, the Company entered into an agreement with Horizon Publications Inc. to sell 33 U.S. community newspapers for $43.7 million." The same disclosure was made in the Company's 2000 annual filing on Form 10-K.

58.     Hollinger International's 2001 annual filing on Form 10-K, dated April 1, 2002, contained similar language, adding that Horizon Publications, Inc. is "controlled by certain members of the Board of Directors" and that "[t]he terms of the transactions were approved by the independent directors of the Company."

59.     Additionally, the Company's 2000 Proxy statement, filed with the SEC on March 22, 2000 stated:

> Effective April 1, 1999, the Company sold approximately 18 properties of the Company's U.S. community newspaper group for an aggregate consideration of approximately $47 million to a company formed by a former Vice President of American Publishing. Certain members of the Board of Directors and senior management of the Company are shareholders of such company. The transaction received an independent fairness opinion and was unanimously approved by the independent Directors of the Company as a market value transaction.

60.     In its 2001 Proxy, filed with the SEC on March 27, 2001, Hollinger International stated the following with respect to the Horizon transaction:

> The Company consummated three transactions with Horizon Publications Inc., a company formed by a former Vice President of American Publishing and having certain members of the Board of Directors and senior management of the Company as shareholders. Effective April 1, 2000, in two transactions valued at approximately $2.5 million and unanimously approved by the Audit Committee and the independent Directors of the Company as market value transactions, American Publishing transferred properties in North Dakota and Washington in exchange for properties in Illinois, and XSTM sold the stock of Westbourne Investments Inc. to Horizon. Effective November 1, 2000, Horizon acquired two properties in California and Idaho in a transaction valued at approximately $4.1 million. The Company had previously contracted to sell such properties to Newspaper Holdings, Inc. as part of a larger transaction, but conveyed title to those two properties directly to Horizon pursuant to an assignment to Horizon from Newspaper Holdings, Inc.

61.     In the Company's 2002 Proxy, filed the SEC on April 2, 2002, the Company stated the following with respect to the Horizon transaction:

> The Company consummated two transactions with Horizon Publications Inc., a company formed by a former Vice President of American Publishing Company and controlled by certain members of the Board of Directors and senior management of the Company as

-13-

shareholders, which were unanimously approved by the Audit Committee and the independent Directors of the Company as market value transactions. American Publishing Company transferred assets in Saagit Valley and San Juan Islands, Washington and Mammoth Lakes, California in exchange for net working capital.

62.     The representations contained in ¶¶ 57-61 were materially false and misleading because Hollinger International failed to disclose: (1) the Board did not approve the deals; (2) but after they had been consummated the Board attempted to retroactively approve them; and (3) that the Board never approved the $8 million loan to Horizon Publications, Inc.

### 2.     *Bradford Publishing Company*

63.     Hollinger International also sold newspapers to Bradford Publishing Company ("Bradford"), which had affiliations with defendant Lord Black, as well.

64.     In the Company's 2001 Proxy, filed with the SEC on March 27, 2001, Hollinger International stated the following with respect to the Bradford Transaction:

> Effective July 20, 2000, the Company sold four properties of the Company's U.S. community newspaper group for an aggregate consideration of approximately $38 million to Bradford Publishing Company, a company formed by a former Director and Vice President of American Publishing. Certain members of the Board of Directors of the Company are shareholders of such company. The transaction was unanimously approved by the Audit Committee and the independent Directors of the Company as a market value transaction.

65.     In the Company's 2002 Proxy, filed the SEC on April 2, 2002, Hollinger International repeated the identical language contained in ¶ 64 with respect to the Bradford Transaction.

66.     The statements made in ¶¶ 64-65 were materially false and misleading because the Company failed to disclose that Bradford was able to purchase the Company's newspapers only

because it had received financial assistance from Hollinger International. Additionally, the Company failed to disclosed that defendants Lord Black and Radler owned and controlled Bradford.

## B.   PAYMENTS RECEIVED FROM NON-COMPETE AGREEMENTS

### 1.   *Sales of U.S. Community Newspapers*

67.   From 1999 through 2001, Hollinger International sold most of its U.S. community newspapers' properties.

68.   On August 13, 1999, Hollinger International filed its quarterly report on Form 10-Q, which was signed by defendant Boultbee, where it described its sales of U.S. community newspapers as follows: "In February 1999, the Company sold approximately 45 community newspapers for gross cash proceeds of approximately $441.0 million.  The proceeds were used to pay down outstanding debt on the Bank Credit Facility."

69.   Also contained in the Company's Form 10-Q, the Company described its pending sale of assets to Horizon Publications, Inc. ("Horizon") as follows: "During the second quarter 1999, the Company entered into an agreement with Horizon Publications Inc. to sell 33 U.S. community newspapers for $43.7 million."

70.   On March 22, 2000, the Company filed its 1999 Proxy Statement wherein the Company disclosed, with respect to the sale of its community newspapers, the following: "Effective April 1, 1999, the Company sold approximately 18 properties of the Company's U.S. community newspaper group for an aggregate consideration of approximately $47 million. . . ."

71.   On November 15, 1999, the Company, in its quarterly report to the SEC on Form 10-Q, disclosed its February 1999 sale of "approximately 45 community newspapers for gross cash proceeds of approximately $441.0 million."

-15-

72.     On March 30, 2000, the Company filed its annual report on Form 10-K, which was signed by the Individual Defendants.  Therein, the Company stated:

> In January 1998, the Company completed the sale of 80 community newspapers for proceeds of $310.0 million. In February 1999, the Company sold 45 community newspapers for approximately $460.0 million, of which $441.0 million was cash. On a pre-tax basis, the sales generated capital gains of approximately $201.2 million in 1998 and approximately $249.2 million in 1999.

73.     On August 2, 2000, the Company announced the sale of its remaining U.S. community newspapers for about $215 million to Bradford Publications Company ("Bradford"), Newspaper Holdings, Inc. of Alabama ("NHIA"), Paxton Media Group, Inc. ("PMG"), and Forum Communications Company ("Forum").

74.     On November 14, 2000, the Company filed its quarterly report on Form 10-Q with the SEC.  Therein, the Company disclosed that the $215 million asset sale to the four buyers described above was completed on October 31, 2000.

75.     On March 27, 2001, Hollinger International filed its 2001 Proxy Statement with the SEC. Therein, the Company stated that "[e]ffective July 20, 2000, the Company sold four properties of the Company's U.S. community newspaper group for an aggregate consideration of approximately $38 million to Bradford." The Company also stated that the Horizon Transaction was "unanimously approved by the Audit Committee and the independent Directors of the Company as market value transactions."

76.     On April 2, 2001, the Company filed its annual report on Form 10-K.  Therein, the Company stated: "During 2000[,] the Company sold virtually all of its remaining [U.S.] community

-16-

newspapers for proceeds totaling $215.0 million." Additionally, the Company reiterated the following disclosures:

> In February 1999, the Company completed the sale of 45 U.S. community newspaper properties for approximately $460.0 million, of which approximately $441.0 million was cash. The proceeds from the sale were used to pay down outstanding debt on the Bank Credit Facility. A pre-tax gain resulting from this transaction of approximately $249.2 million was recognized on this transaction.

77.     On May 15, 2001, the Company filed its quarterly report with the SEC on Form 10-Q. The Company's Form 10-Q reiterated the statements contained in ¶¶ 72 -76.

78.     The Company's disclosures from August 13, 1999 through May 15, 2001 were false and misleading because the Company failed to disclose: (1) that non-compete payments were made in connection with Hollinger International's sales of its U.S. community newspapers; (2) that these non-compete payments totaling approximately $26 million were made to parties other than the Company, including Hollinger Inc., who received $2 million in non-compete payments in connection to the Company's May 11, 1998 asset sale to Internec Publishing Company ("Internec"); (3) that all representations that Hollinger International would receive $215 million were false because the non-compete payments were coming directly out of sale proceeds; (4) that these non-compete payments were made to defendants Lord Black, Radler, Boultbee, and Atkinson; and that due to the non-compete payments, the sale of Hollinger International's U.S. community newspapers was less than $215 million.

**2.     *Sales to CanWest Global Communications Corp.***

79.     On July 31, 2000, Hollinger International announced that it had entered into an agreement to sell certain assets to CanWest Global Communications Corp. ("CanWest").

80.     On August 14, 2000, the Company filed its quarterly report on Form 10-Q. Therein, the Company disclosed that the CanWest purchase price would be $2.35 billion and that "cash proceeds [would be used] to eliminate bank debt and possibly cancel debentures and shares and create a substantial reverse of liquid assets."

81.     On August 16, 2000, Hollinger International announced that it, Hollinger, Inc., Southam Inc., and Hollinger Canadian Newspapers had reached an agreement to sell certain of its assets to CanWest. Commenting on this, defendant Lord Black stated: "Hollinger International expects to emerge from this process with drastically reduced debt levels and [a] smaller number of outstanding share, a stronger strategic position in relation to other media . . ., appreciably higher earnings per share, and a larger cash reserve . . . ."

82.     On November 14, 2000, the Company filed it quarterly report on Form 10-Q. Therein, the Company again stated that the CanWest sale for $2.35 billion.

83.     On December 1, 2000, Hollinger International issued a press release announcing the completion of the CanWest for $2.1 billion. Again, the Company stated that this money would be used to "repay all of its back debt and certain other debt" and "dramatically strengthen its balance sheet."

84.     The statements contained in ¶¶ 79-83 were materially false and misleading when made because Hollinger International failed to disclosed: (1) that part of the proceeds from the sales to CanWest would be go to, *inter alla*, defendant Lord Black; and (2) that the revenue received by the Company was substantially less than reported due to non-compete agreements that defendant Lord Black and others benefitted from.

-18-

85.     More false and misleading statements were made by Hollinger International when it filed its quarterly report on Form 10-Q with the SEC on May 15, 2001. Therein, the Company falsely disclosed the non-compete payments as follows:

> Also, as required by CanWest as a condition to the transaction, Ravelston, Hollinger Inc. and Messrs. Black, Radler, Boultbee and Atkinson, entered into non-competition agreements with CanWest pursuant to which each agreed not to compete directly or indirectly in Canada with the Canadian businesses sold to CanWest for a five year period, subject to certain limited exceptions, for aggregate consideration received by Ravelston and the executives of Cdn. $80 million ($53 million) paid by CanWest in addition to the purchase price referred to above, consisting of Cdn. $38 million paid to Ravelston, Cdn. $19 million paid to Mr. Black, Cdn. $19 million paid to Mr. Radler, Cdn. $2 million paid to Mr. Boultbee and Cdn. $2 million paid to Mr. Atkinson.

86.     The above statement was materially false and misleading when made because Hollinger International failed to disclose: (1) that the $53 million in non-compete payments actually reduced the purchase price for CanWest; (2) that defendants Boultee and Atkinson were not required by CanWest to enter into a non-compete agreement; and (3) that defendants Lord Black and Radler, among others determined the allocations of the non-compete payments, not CanWest.

87.     On March 31, 2003, Hollinger International filed its annual report on Form 10-K with the SEC. The Company's Form 10-K was signed by the Individual Defendants. Therein, the Company stated, with respect to the CanWest transaction, that the non-compete agreements were "required as a condition to the transaction," and that the Company's "independent directors approved the terms of these payments.

88.     The statement contained in the preceding paragraph was false and misleading when made because the non-compete agreements were not a condition to the CanWest transaction and that

-19-

the such payments were never approved by the Company's independent directors. Additionally, the above statement was false and misleading when made because the Audit Committee attempted to ratify the non-compete payments that had already been made.

### 3. *Sales to Osprey Media Group Inc.*

89. On August 14, 2001, the Company disclosed in its quarterly report on Form 10-Q, which was signed by defendant Boultbee, that it had sold most if its remaining Canadian newspapers for Cdn. $220 million to Osprey Media Group Inc. ("Osprey"). More specifically, the Company stated: "On July 31, 2001, the Company announced the sale of most of its remaining Canadian newspapers for approximately Cdn.$220 million, subject to adjustments. Included in this sale were community newspapers in Ontario such as The Kingston Whig- Standard, The Sault Star and the Peterborough Examiner. The consideration for this sale was paid in cash at closing."

90. Similar disclosures of the sales to Osprey were made in the Company's November 14, 2001, quarterly report on Form 10-Q; its December 20, 2001 and March 25, 2002 registration statements on Forms S-3; and its December 31, 2001 and April 4, 2002 Prospectuses on Forms 424 B3.

91. The disclosed contained in ¶¶ 89-90 were false and misleading because the Company failed to disclose: (1) that a portion of the proceeds of the Osprey transaction went to Lord Black and other defendants; and (2) that the payments received by defendant Lord Black and others were paid through non-compete agreements

92. On April 1, 2002, Hollinger International filed is annual report on Form 10-K. Therein, the Company stated the following with respect to the Osprey transaction:

-20-

In two separate transactions in July and November 2001, the Company and Hollinger L.P. completed the sale of most of its remaining Canadian newspapers to Osprey Media Group Inc. ("Osprey") for total sale proceeds of approximately Cdn. $255.0 million ($166.0 million) plus closing adjustments primarily for working capital. Included in these sales were community newspapers in Ontario such as The Kingston Whig-Standard, The Sault Star, the Peterborough Examiner, the Chatham Daily News and The Observer (Sarnia). Pre-tax gains of approximately $0.8 million were recognized on these sales.

93.     Additionally, the Company stated:

In connection with the two sales of Canadian newspaper properties to Osprey in 2001, to satisfy a closing condition, the Company, Hollinger Inc., Lord Black of Crossharbour PC©), OC, KCSG and three senior executives entered into non-competition agreements with Osprey pursuant to which each agreed not to compete directly or indirectly in Canada with the Canadian businesses sold to Osprey for a five-year period, subject to certain limited exceptions, for aggregate consideration of Cdn. $7,900,000 ($5,100,000). Such consideration was paid to Lord Black and the three senior executives and has been approved by the Company's independent directors.

94.     On April 2, 2002, the Company filed its 2002 Proxy statement wherein the Company

disclosed the break down of the non-compete payments as follows:

In connection with the two sales of Canadian newspaper properties to Osprey Media Group Inc. ("Osprey") in 2001, to satisfy a closing condition, Hollinger Inc., the Company, Lord Black and Messrs. Radler, Atkinson and Boultbee entered into non-competition agreements with Osprey pursuant to which each agreed not to compete directly or indirectly in Canada with the Canadian businesses sold to Osprey for a five year period, subject to certain limited exceptions, for aggregate consideration of Cdn.$7,940,000, consisting of Cdn.$3,591,905 paid to Lord Black, Cdn.$3,591,905 paid to Mr. Radler, Cdn.$378,095 paid to Mr. Atkinson and Cdn.$378,095 paid to Mr. Boultbee.

-21-

95.     The statements contained in ¶¶ 93 and 94 were also materially false and misleading

when made because the Company failed to disclosed that the independent auditors did not approved

the terms of the Osprey transaction and the non-compete payments.

## C.     RAVELSTON MANAGEMENT SERVICES AGREEMENTS

96.     Hollinger International and Ravelston have, since at least 1995, entered into

management services agreements. Unbeknownst to the Class Members, Ravelston is owned by

defendants Lord Black, Radler, Colson, Boultbee, and Atkinson.

97.     The first disclosure concerning management services agreements with Ravelston

occurred on March 27, 2001, when the Company filed its 2001 Proxy statement with the SEC.

Therein, the Company falsely disclosed:

> Pursuant to the Services Agreements, Ravelston provides advisory,
> consultative, procurement and administrative services to the
> Company and its respective subsidiaries including, among other
> things, strategic advice, planning and financial services (including
> advice and assistance with respect to acquisitions, divestitures or joint
> venture arrangements); consulting services regarding risk
> management and insurance coverage; and assistance in operational
> matters. In 2000 and 1999 in the aggregate approximately $24 million
> plus Cdn.$18.5 million and $38 million, respectively, was paid in fees
> pursuant to the Services Agreements. The fees paid by the Company
> were approved by the Audit Committee as reasonable for the services
> rendered. The amount of fees payable pursuant to the Services
> Agreements for 2001 and future years will be determined annually by
> agreement between Ravelston and the Audit Committee. The Services
> Agreements may be terminated by either party upon 180 days prior
> written notice. Ravelston's affiliates include Messrs. Black, Radler,
> Colson, Atkinson, Boultbee and Creasey and Mrs. Black, who are
> officers and/or directors of both Hollinger Inc. and the Company and
> who, with the exception of Mrs. Black, do not receive compensation
> directly from the Company in their capacities as executive officers of
> the Company or Hollinger Inc. Additionally, $1.56 million was paid
> to Ravelston's affiliate, Moffat Management, for services provided to
> the Company's Community Newspaper Group.

-22-

98.     In the Company's 2002 Proxy Statement, filed with the SEC on April 2, 2002, the

Company stated, with respect to Ravelston, the following:

> Pursuant to the Services Agreements, Ravelston provides advisory, consultative, procurement and administrative services to the Company and its respective subsidiaries including, among other things, strategic advice, planning and financial services (including advice and assistance with respect to acquisitions, divestitures or joint venture arrangements); consulting services regarding risk management and insurance coverage; and assistance in operational matters. In 2001 approximately $25.8 million plus Cdn.$7.6 million was paid in fees pursuant to the Services Agreements. The fees paid by the Company were approved by the Audit Committee as reasonable for the services rendered. The amount of fees payable pursuant to the Services Agreements for 2002 and future years will be determined annually by agreement between Ravelston and the Audit Committee. The Services Agreements may be terminated by either party upon 180 days prior written notice. Ravelston's affiliates include Lord Black and Messrs. Radler, Colson, Atkinson, Boultbee and Creasey and Mrs. Black, who are officers and/or directors of both Hollinger Inc. and the Company and who, with the exception of salaries paid to Lord Black and Mr. Colson by The Telegraph and salary to Mrs. Black, do not receive compensation directly from the Company in their capacities as executive officers of the Company or Hollinger Inc. Of the aforementioned Services Agreements fees, approximately $770,000 and $230,000, respectively, were paid to Ravelston's affiliates, Moffat Management and Black-Amiel Management, for services provided.

99.     In the Company's 2003 Proxy statement, filed with the SEC on March 31, 2003, the

Company, with respect to Ravelston stated:

> Pursuant to the Services Agreements and separate services agreements with Moffatt Management and Black-Amiel Management, both of which are affiliates of RMI, RMI and such affiliates provide advisory, consultative, procurement and administrative services to the Company and its respective subsidiaries including, among other things, strategic advice, planning and financial services (including advice and assistance with respect to acquisitions, divestitures or joint venture arrangements); consulting services regarding risk management and insurance coverage; and

assistance in operational matters. In 2002 approximately $21.4 million plus Cdn.$3.6 million was paid in fees to Ravelston and RMI pursuant to the Services Agreements and approximately $1,176,000 in the aggregate was paid to Moffat Management and Black-Amiel Management pursuant to separate service agreements. In addition to the services provided under the Services Agreements and separate services agreements, in 2002 Lord Black and Mr. Colson received $719,000 in the aggregate from The Telegraph in respect of executive services provided. The fees paid by the Company, its subsidiaries and affiliates were approved by the Audit Committee as reasonable for the services rendered. The amount of fees payable pursuant to the Services Agreements and separate services agreements for 2003 and future years will be determined annually by agreement between RMI and such affiliates and the Audit Committee. The Services Agreements and separate services agreements may be terminated by either party upon 180 days prior written notice. RMI's affiliates include Lord Black and Messrs. Radler, Colson, Atkinson, Boultbee and Creasey and Mrs. Black, who are officers and/or directors of both Hollinger Inc. and the Company and who, with the exception of amounts paid to Lord Black and Mr. Colson by The Telegraph and Mrs. Black's salary and bonus in the aggregate amount of $276,000 paid by Chicago Sun-Times, Inc., plus $29,297 (19,500 pounds sterling which has been converted into U.S. Dollars at the average rate of 1.5024 for purposes of this disclosure) paid by The Telegraph to Mrs. Black for articles written, do not receive salaries directly from the Company in their capacities as executive officers of the Company or Hollinger Inc. In connection with the offering by Hollinger Inc. of its senior secured notes, RMI has pledged as security its rights under the Services Agreements.

100. The statements contained in ¶¶ 97-99 were each materially false and misleading because the Company failed to disclose: (1) that the terms of the Ravelston services agreements were drafted in favor of Ravelston; (2) that amounts paid under these agreements was excessive and unreasonable; (3) that certain management services agreements were assigned by Ravelston to RMI; (4) that RMI and Ravelston were paid pursuant to those management services agreements; and (5) that Ravelston did not provide any services to the Company to earn its fees.

101.    On March 31, 2003, Hollinger International filed its annual report on Form 10-K with the SEC. The Company's Form 10-K was signed by the Individual Defendants. Therein, the Company stated, with respect Ravelston, the following:

> The Company and its subsidiaries have entered into a services agreement with The Ravelston Corporation Limited ("Ravelston"), whereby Ravelston acts as manager of the Company and carries out head office and executive responsibilities. This services agreement was assigned on July 5, 2002 to Ravelston Management Inc. ("RMI"), a wholly-owned subsidiary of Ravelston. Ravelston and RMI billed to the Company and its subsidiaries fees totalling $23,731,000, $28,956,000 and $33,618,000 for 2002, 2001 and 2000, respectively, pursuant to this agreement.
>
> Certain executives of Ravelston and Moffat Management and Black-Amiel Management, affiliates of Ravelston and RMI, have separate services agreements with certain subsidiaries of the Company. Amounts paid directly by subsidiaries of the Company pursuant to such agreements were $1,895,000, $1,697,000 and $3,659,000 for 2002, 2001 and 2000, respectively. The fees under Ravelston's and RMI's services agreement and the fees paid directly to executives and affiliates of Ravelston, in aggregate, are negotiated with and approved by the Company's independent directors.

102.    Additionally, the Company disclosed that it could no longer stand behind the payments that it had previously represented as being reasonable. In fact, the Company stated that it was overpaying for the Ravelston management services.

103.    However, the above disclosure failed to tell the truth about the Ravelston management services agreements. The truth of those management services agreements was that these agreements were a mechanism to funnel money to defendant Lord Black and others. Additionally, under these management services agreements, Ravelston did nothing in return for collecting its fee.

104.    Moreover, the above discloses also failed to indicate: (1) that the Audit Committee never reviewed the Ravelston management services agreements; and (2) that in approving the

-25-

agreements, the Audit Committee never considered any performance-based criteria in evaluating the fee proposals.

**D.  CANWEST'S MANAGEMENT SERVICES AGREEMENT WITH RAVELSTON**

105.  On July 31, 2000, the Company issued a press release announcing the CanWest transaction. More specifically, the Company stated:

> This transaction is consistent with Hollinger's stated objective for its Canadian restructuring initiative launched earlier this year. The sale price reflects the full enterprise value of the assets to be sold with the newspapers being valued at approximately 10 times EBITDA. Through its 15% shareholding in CanWest, its 50% direct interest in the National Post and as continuing manager of these assets, Hollinger will continue to participate in the future growth and exploitation of the franchise value of the assets in conjunction with CanWest's television, cable channel, radio and other Canadian and international media assets.

106.  On August 14, 2000, the Company filed its quarterly report on Form 10-Q, which was signed by defendant Boultbee. With respect to the CanWest management services agreement, the Company, in its Form 10-Q, stated:

> On July 31, 2000, the Company announced that an agreement had been entered into to sell to CanWest Global Communications Corp. ("CanWest") for approximately $2.35 billion (Cdn $3.5 billion), subject to adjustments, the following Canadian Newspaper assets:
>
> — a 50% interest in the National Post, while continuing as managing partner;
>
> — all metropolitan and a large number of community newspapers in Canada (including the Ottawa Citizen, Vancouver Sun, the Province, the Calgary Herald, the Edmonton Journal, the Montreal Gazette, The Windsor Star, The Regina Leader Post, the Star Phoenix and The Victoria Times-Colonist);
>
> — the Southam Magazine and Information Group, and

— certain operating Canadian Internet properties including canada.com.

The purchase price will be payable as to approximately $470 million (Cdn$700 million) in shares of CanWest and as to the balance, 75% in cash and 25% in subordinated debentures of a senior company in the CanWest group. The Company will nominate two directors to the CanWest Board, commensurate with its opening equity interest of 15%. Conrad Black, the Company's Chairman and CEO, will be the Chairman of the National Post. With respect to the other newspaper assets being sold to CanWest, Mr. Black and his associates will enter into a management services agreement for at least 17 months in order to ensure operating continuity and to facilitate a smooth transition to the new arrangements.

107.    On December 1, 2000, the Company filed a current report with the SEC on Form 8-K.

Therein, Hollinger International set forth asset sales agreements for the CanWest as follows:

4.36 INTER-AFFILIATE ARRANGEMENTS

Schedule 4.36 sets forth a complete list of all Contracts between and among Ravelston, Hollinger Inc., Hollinger, any Affiliate or subsidiary of Hollinger and the Excluded Businesses relating to the Purchased Businesses and the National Post Business. Except as disclosed on Schedule 4.36, all such Contracts are on reasonable commercial terms that are not less advantageous to any party than if such Contract had been obtained from a Person or company dealing at arm's length with such party. All such Contracts may be terminated by CanWest upon not more than 30 days prior notice without bonus or penalty.

108.    Additionally, on April 2, 2001, the Company filed its annual report on Form 10-K.

Therein and with respect to the CanWest deal, the Company stated:

On November 16, 2000, the Company and its affiliates, Southam and Hollinger L.P. ("Hollinger Group") completed the sale of most of its Canadian newspapers and related assets to CanWest. Included in the sale were the following assets of the Hollinger Group:

• a 50% interest in National Post, with the Company continuing as managing partner;

- the metropolitan and a large number of community newspapers in Canada (including the Ottawa Citizen, The Vancouver Sun, The Province (Vancouver), the Calgary Herald, the Edmonton Journal, The Gazette (Montreal), The Windsor Star, the Regina Leader Post, the Star Phoenix and the Times-Colonist (Victoria); and

- the operating Canadian Internet properties, including canada.com.

The sale resulted in the Hollinger Group receiving approximately Cdn. $1.7 billion ($1.1 billion) cash, approximately Cdn. $425 million ($277 million) in voting and non-voting shares of CanWest at fair value (representing an approximate 15.6% equity interest and 5.7% voting interest) and subordinated non-convertible debentures of a holding company in the CanWest group at fair value of approximately Cdn. $697 million ($456 million). The aggregate sale price of these properties at fair value was approximately Cdn. $2.8 billion ($1.8 billion), plus closing adjustments for working capital at August 31, 2000 and cash flow and interest for the period September 1 to November 16, 2000 which in total approximates an additional $40.7 million. $972 million of the cash proceeds from this sale were used to pay down the Company's Bank Credit Facility.

109.    The statement contained in ¶¶ 105-108 were each materially false and misleading when made because the Company failed to disclose: (1) that post-closing management services agreement was originally to be with Hollinger International, not Ravelston; (2) that defendant Lord Black unilaterally decided that the agreement was to be with Ravelston; (3) that CanWest rejected the Ravelston post-closing agreement proposed by Lord Black and only agreed to pay 32% of the proposal; (4) that the management fee rejected by CanWest was the same amount that Ravelston had been charging the Company under its management services agreement; (4) that defendants Lord Black and Radler negotiated for themselves an annual management and termination fee paid by CanWest in the event that it terminated its management services agreement or even if Ravelston were to terminate is own management services agreement; and (5) that defendant Lord Black and other benefitted from the management services agreements.

110.    On April 1, 2002, the Company filed its annual report on Form 10-K. Therein, the

Company disclosed for the first time the terms of the Ravelston management services agreement as

follows:

> In connection with the sale to CanWest, Ravelston, a holding
> company controlled by Lord Black through which most of his interest
> in the company is ultimately controlled, entered into a management
> services agreement with CanWest and National Post pursuant to
> which it agreed to continue to provide management services to the
> Canadian businesses sold to CanWest in consideration for an annual
> fee of Cdn. $6 million ($4 million) payable by CanWest. In addition,
> CanWest will be obligated to pay Ravelston a termination fee of Cdn.
> $45 million, in the event that CanWest chooses to terminate the
> management services agreement or Cdn. $22.5 million, in the event
> that Ravelston chooses to terminate the agreement (which cannot
> occur before December 31, 2002). Also, as required by CanWest as
> a condition to the transaction, the Company, Ravelston, Hollinger
> Inc., Lord Black and three senior executives entered into
> non-competition agreements with CanWest pursuant to which each
> agreed not to compete directly or indirectly in Canada with the
> Canadian business sold to CanWest for a five-year period, subject to
> certain limited exceptions, for aggregate consideration of Cdn. $80
> million ($53 million) paid by CanWest in addition to the purchase
> price referred to above of which Cdn. $38 million ($25.2 million) was
> paid to Ravelston and Cdn. $42 million ($27.8 million) was paid to
> Lord Black and the three senior executives. The Company's
> independent directors have approved the terms of these payments.

111.    The above disclose failed to tell the full truth about the CanWest/Ravelston

management services agreement. More specifically, the Company failed to disclose: (1) that the

management services agreement did not benefit Hollinger International, rather, it was for the benefit

of Ravelston; (2) that Ravelston would not provided any services under the agreement but still would

be paid its exorbitant fee; and (3) that the independent directors did not approve this transaction.

### E. THE TELEGRAPH GROUP AND OTHER SELF-DEALING TRANSACTIONS

112.    As stated previously, the Company filed its annual report with the SEC on Form 10-K on April 2, 2002. Therein, the Company stated that dividends are discretionary, are declared by the Board, and that the ability of Hollinger International's subsidiaries to pay dividends are subject to statutory restrictions and restrictions in debt agreements. To the contrary, Lord Black and only Lord Black would determine when and if dividends were declared by the Company or its subsidiaries.

113.    The Company's 2002 and 2003 Proxy Statements contained disclosures about Lord Black's compensation but failed to disclose that dividends were being paid to Lord Black by the Company's subsidiaries. More specifically, the Company's 2002 Proxy stated that Lord Black was paid a salary of $443,283, a bonus of $250,000, options on 400,000 shares of Company stock, and paid $123,302 in "other compensation."

114.    The Company's 2003 Proxy Statement, filed with SEC on March 31, 2003, stated that Lord Black was paid a salary of $462,460 plus options on 375,000 shares of Company stock, and $248,000 in "other compensation." Additionally, the Company stated that Lord Black received salaries paid by both the Telegraph Group and Ravelston under management services agreements.

115.    The statements contained in ¶¶ 113-114 were materially false and misleading when made because the Company failed to disclose that Lord Black was being paid millions of dollars in the form of dividends by the Telegraph Group.

### F.    KPMG'S PARTICIPATION IN THE FRAUD

116.    During the Class Period and as stated above, Defendant KPMG (referred to as "Audit Defendant") issued false, clean audit reports regarding the Company's financial statements.

117.     As a result of false, clean audit reports, the Audit Defendant violated the following

Generally Accepted Auditing Standards ("GAAS") with respect to their certification of the

Company's financial reports during the Class Period:

(A)     GAAS (AU Section 411) which requires that the auditors opinion that

financial statements present fairly an entity's financial position, results of

operations, and cash flows in conformity with GAAP should be based on

judgement as to whether (a) the accounting principles are selected and

applied have general acceptance; (b) the accounting principles are appropriate

in the circumstances; (c) the financial statements, including the related notes,

are informative of matters that may affect their use, understanding, and

interpretation; (d) the information presented in the financial statements is

classified and summarized in a reasonable manner, that is, neither too

detailed nor too condensed; and (e) the financial statements reflect the

underlying events and transactions in a manner that presents the financial

position, results of operations, and cash flows stated within a range of

acceptable limits, that is, limits that are reasonable and practicable to attain

in financial statements.

(B)     GAAS (AU 150)

1.     General Standard No 1 was violated, which requires that the audit is

to be performed by a person or persons having adequate technical

training and proficiency as an auditor.

-31-

2.     General Standard No. 2 was violated, which requires that in all matters relating to the assignment, an independence in mental attitude is to be maintained by the auditor or auditors.

3.     General Standard No. 3 was violated, which requires that due professional care is to be exercised in the performance of the audit and in the preparation of the report.

4.     Standard of Field Work No. 1 was violated, which requires that the work is to be adequately planned and assistants, if any, are to be properly supervised.

5.     Standard of Field Work No. 2 was violated, which requires that a sufficient understanding of internal controls is to be obtained to plan the audit and to determine the nature, timing, and extent of tests to be performed.

6.     Standard of Field Work No. 3 was violated, which requires that sufficient competent evidential matter is to be obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under examination.

7.     Standard of Reporting No. 1 was violated, which requires that the report shall state whether the financial statements are presented in accordance with GAAP.

8. Standard of Reporting No. 3 was violated, which requires that the informative disclosures in the financial statements are to be regarded as reasonably adequate unless otherwise stated.

118. During the Class Period, the Audit Defendant failed to adhere the GAAS standards and therefore are liable to the investing public for aiding and abetting the Company in its scheme to defraud the public.

## THE TRUTH BEGINS TO EMERGE

119. The Company's disclosures regarding self-dealing and misappropriation of Company funds by defendants in March 2003 shocked the investment community.

120. On May 22, 2003, the Company's debt was downgraded to "junk" as was the debt of Hollinger Inc. Also, the long-term credit rating of Hollinger Inc. Was lowered to SD by Standard & Poors. Later on June 26, 2003, Dominion Bond Rating Service ("DBRS") announced that the debt rating on Hollinger's Senior Unsecured notes would be held at DB low.

121. On June 17, 2003, the Board established a Special Committee conduct an investigation into the allegations of self-dealing.

122. In mid-November 2003, defendant Colson admitted that Hollinger International was subject of an SEC investigation.

123. On November 21, 2003, the Audit Committee announced their recommendation that Lord Black resign from the Company, which he did.

## EFENDANTS' VIOLATION OF GAAP RULES

124.    Given these accounting irregularities, the Company announced financial results that were in violation of GAAP, the Company's own announced revenue recognition policies, and the following principles:

(a)    The principle that "interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements" was violated (APB No. 28, ¶10);

(b)    The principle that "financial reporting should provide information that is useful to present to potential investors and creditors and other users in making rational investment, credit, and similar decisions" was violated (FASB Statement of Concepts No. 1, ¶34);

(c)    The principle that "financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events, and circumstances that change resources and claims to those resources" was violated (FASB Statement of Concepts No. 1, ¶40);

(d)    The principle that "financial reporting should provide information about an enterprise's financial performance during a period" was violated (FASB Statement of Concepts No. 1, ¶42);

(e)    The principle that "completeness, meaning that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions" was violated (FASB Statement of Concepts No. 2, ¶79);

(f)     The principle that "financial reporting should be reliable in that it represents what it

purports to represent" was violated  (FASB Statement of Concepts No. 2, ¶¶58-59);

and

(g)     The principle that "conservatism be used as a prudent reaction to uncertainty to try

to ensure that uncertainties and risks inherent in business situations are adequately

considered" was violated.  (FASB Statement of Concepts No. 2, ¶95).

125.    The adverse information concealed by defendants during the Class Period and

detailed above was in violation of Item 303 of Regulation S-K under the federal securities law (17

C.F.R. 229.303).

## UNDISCLOSED ADVERSE FACTS

126.    The market for Hollinger International's publicly traded securities was open, well-

developed and efficient at all relevant times.  As a result of these materially false and misleading

statements and failures to disclose, Hollinger International's publicly traded securities traded at

artificially inflated prices during the Class Period.  Plaintiff and other members of the Class

purchased or otherwise acquired Hollinger International publicly traded securities relying upon the

integrity of the market price of Hollinger International's publicly traded securities and market

information relating to Hollinger International, and have been damaged thereby.

127.    During the Class Period, defendants materially misled the investing public, thereby

inflating the price of Hollinger International's publicly traded securities, by publicly issuing false and

misleading statements and omitting to disclose material facts necessary to make defendants'

statements, as set forth herein, not false and misleading.  Said statements and omissions were

materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

128.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Hollinger International's business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Hollinger International and its business, prospects and operations, thus causing the Company's publicly traded securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's publicly traded securities at artificially inflated prices, thus causing the damages complained of herein.

## ADDITIONAL SCIENTER ALLEGATIONS

129.    As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Hollinger International, their control over, and/or receipt and/or modification of Hollinger International's allegedly materially misleading

-36-

misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Hollinger International, participated in the fraudulent scheme alleged herein.

130.    Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public. The ongoing fraudulent scheme described in this complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

131.    Defendants Lord Black, Radler, Boultbee, and Atkinson were motivated to misrepresent and conceal material facts from the shareholders so that these defendants could successfully pay themselves millions of dollars in purported non-compete payments as part of the Company's payments to Ravelston for purported management services which Ravelston never provided.

132.    Additionally, defendant Perle was motivated to assist in the defendants' fraud because he served as head of a Hollinger subsidiary, Hollinger Digital, for which he was paid about $300,000 per year. Moreover, defendant Perle serves as a Board member of Trireme Partner L.P. and is managing partner of an investment company, Trireme Associates ("Trireme") in which Hollinger invested $2.5 million last year.

133.    Defendant Kissinger was motivated to assist in the defendants' fraud because he serves on the Trireme Strategic Advisory Board.

134.    Defendant Paris was motivated to assist in the fraud because he is managing director of Berenson & Company. This Company acted as a financial advisor to Hollinger in 2002.

-37-

135.    Defendant Thompson was motivated to assist in the fraud because he received

substantial political contributions from Lord Black.

### Applicability Of Presumption Of Reliance:
### Fraud-On-The-Market Doctrine

136.    At all relevant times, the market for Hollinger International's publicly traded

securities was an efficient market for the following reasons, among others:

(a) Hollinger International's stock met the requirements for listing, and was listed

and actively traded on the NYSE, a highly efficient and automated market;

(b) As a regulated issuer, Hollinger International filed periodic public reports with

the SEC and the NYSE;

(c) Hollinger International regularly communicated with public investors via

established market communication mechanisms, including through regular disseminations of press

releases on the national circuits of major newswire services and through other wide-ranging public

disclosures, such as communications with the financial press and other similar reporting services;

and

(d) Hollinger International was followed by several securities analysts employed by

major brokerage firms who wrote reports which were distributed to the sales force and certain

customers of their respective brokerage firms.  Each of these reports was publicly available and

entered the public marketplace.

137.    As a result of the foregoing, the market for Hollinger International's publicly traded

securities promptly digested current information regarding Hollinger International from all publicly

available sources and reflected such information in Hollinger International's stock price.  Under

these circumstances, all purchasers of Hollinger International's publicly traded securities during the Class Period suffered similar injury through their purchase of Hollinger International's publicly traded securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

138. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Hollinger International who knew that those statements were false when made.

## COUNT I

### Violation Of Section 10(b) Of
### The Exchange Act And Rule 10b-5
### Promulgated Thereunder Against All Defendants

139. Plaintiff repeats and reiterates the allegations set forth above as though fully set forth herein. This claim is asserted against all defendants.

140. During the Class Period, defendant Hollinger International and the Individual Defendants, and each of them, carried out a plan, scheme and course of conduct which was intended

-39-

to and, throughout the Class Period, did: a) deceive the investing public, including plaintiff and other Class members, as alleged herein; b) artificially inflate and maintain the market price of Hollinger International's publicly traded securities; and c) cause plaintiff and other members of the Class to purchase Hollinger International's publicly traded securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants Hollinger International and the Individual Defendants, and each of them, took the actions set forth herein.

141.    These defendants: a) employed devices, schemes, and artifices to defraud; b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Hollinger International's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. These defendants are sued either as primary participants in the wrongful and illegal conduct charged herein. The Individual Defendants are also sued as controlling persons of Hollinger International, as alleged below.

142.    In addition to the duties of full disclosure imposed on defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. § 210.01 et seq.) and S-K (17 C.F.R. § 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and performance so that the market prices

of the Company's publicly traded securities would be based on truthful, complete and accurate information.

143.     Hollinger International and the Individual Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, operations and future prospects of Hollinger International as specified herein.

144.     These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Hollinger International's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Hollinger International and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Hollinger International's securities during the Class Period.

145.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: a) each of the Individual Defendants was a high-level executive and/or director at the Company during the Class Period; b) each of the Individual Defendants, by virtue of his responsibilities and activities as a senior executive officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's

internal budgets, plans, projections and/or reports; c) the Individual Defendants enjoyed significant

personal contact and familiarity with each other and were advised of and had access to other

members of the Company's management team, internal reports, and other data and information about

the Company's financial condition and performance at all relevant times; and d) the Individual

Defendants were aware of the Company's dissemination of information to the investing public which

they knew or recklessly disregarded was materially false and misleading.

146.    These defendants had actual knowledge of the misrepresentations and omissions of

material facts set forth herein, or acted with reckless disregard for the truth in that they failed to

ascertain and to disclose such facts, even though such facts were available to them. Such defendants'

material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose

and effect of concealing Hollinger International's operating condition, business practices and future

business prospects from the investing public and supporting the artificially inflated price of its

securities. As demonstrated by defendants' overstatements and misstatements of the Company's

financial condition and performance throughout the Class Period, the Individual Defendants, if they

did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in

failing to obtain such knowledge by deliberately refraining from taking those steps necessary to

discover whether those statements were false or misleading.

147.    As a result of the dissemination of the materially false and misleading information

and failure to disclose material facts, as set forth above, the market price of Hollinger International's

securities were artificially inflated during the Class Period. In ignorance of the fact that market

prices of Hollinger International's publicly traded securities were artificially inflated, and relying

directly or indirectly on the false and misleading statements made by defendants, or upon the

-42-

integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiff and the other members of the Class acquired Hollinger International securities during the Class Period at artificially high prices and were damaged thereby.

148.    At the time of said misrepresentations and omissions, plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had plaintiff and the other members of the Class and the marketplace known of the true performance, business practices, future prospects and intrinsic value of Hollinger International, which were not disclosed by defendants, plaintiff and other members of the Class would not have purchased or otherwise acquired their Hollinger International publicly traded securities during the Class Period, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

149.    By virtue of the foregoing, Hollinger International and the Individual Defendants have each violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

150.    As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## COUNT II

### Violation Of Section 20(a) Of The Exchange Act Against
### the Individual Defendants

151.    Plaintiff repeats and reiterates the allegations as set forth above as if set forth fully herein. This claim is asserted against the Individual Defendants.

152.    Each of the Individual Defendants acted as a controlling person of Hollinger International within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's actual performance, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading. Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

153.    In addition, each of the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

154.    As set forth above, Hollinger International and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By

-44-

virtue of their controlling positions, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**WHEREFORE**, plaintiff prays for relief and judgment, as follows:

(a) Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

(b) Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

## <u>JURY TRIAL DEMANDED</u>

Plaintiff hereby demands a trial by jury on all issues so triable.

-45-

Dated:  February 18, 2004

KENNETH MOZINGO, individually and on behalf of all others similarly situated, Plaintiff

By:  _____

Marvin A. Miller
Jennifer W. Sprengel
Matthew E. Van Tine
**MILLER FAUCHER and CAFFERTY LLP**
30 North LaSalle Street
Suite 3200
Chicago, Illinois  60602
(312) 782-4880

*Designated Local Counsel*

Marc A. Topaz
Richard A. Maniskas
**SCHIFFRIN & BARROWAY, LLP**
Three Bala Plaza East
Suite 400
Bala Cynwyd, Pennsylvania  19004
(610) 667-7706

Samuel H. Rudman
David Rosenfeld
**CAULEY GELLER BOWMAN
     & RUDMAN, LLP**
200 Broadhollow Road, Suite 406
Melville, New York  11747
(631) 367-7100

*Attorneys for Plaintiff*

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

I, (print name) KENNETH D. MOZINGO ("Plaintiff") declare, as to the claims asserted under the federal securities laws, that:

1. Plaintiff has reviewed the Complaint and authorizes its filing.

2. Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action.

3. Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff's transaction(s) in the Hollinger International, Inc. (NYSE: HLR) security that is the subject of this action during the Class Period is/are as follows[1]:

*IN IRA accent with D Waterhouse*

| No. of Shares | Buy/Sell | Date | Price Per Share |
|---|---|---|---|
| 50 | Buy | 2/10/2000 | 12.56 |
| 50 | Sold | 4/5/2000 | 10.69 |
| | | | |
| | | | |

[1]List additional transactions on a separate sheet of paper, if necessary.

5. Plaintiff has complete investment authority and is the agent and attorney-in-fact with full power and authority to bring a suit to recover for investment losses.

6. During the three years prior to the date of this Certification, Plaintiff has sought to serve or served as a representative party or a class in the following actions filed under the federal securities laws (if none, so indicate): _____.

7. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 13 day of FEBRUARY , 2004

Kenneth D. Mozingo
Signature

KENNETH D. MOZINGO
Print Name



# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

# Civil Cover Sheet



DOCKETED

FEB 1 9 2004

This automated JS-44 conforms generally to the manual JS-44 approved by the Judicial Conference of the United States in September 1974. The data is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. The information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is authorized for use only in the Northern District of Illinois.

**Plaintiff(s): KENNETH MOZINGO,**

County of Residence: Kendall County

Plaintiff's Atty: Miller Faucher and Cafferty LLP
30 North LaSalle Street, Suite 3200
Chicago, Illinois 60602
(312) 782-4880

**Defendant(s):CONRAD N. BLACK, et al.,**

County of Residence: Cook County

Defendant's Atty:

04C 1276

II. Basis of Jurisdiction:     **3. Federal Question (U.S. not a party)**

III. Citizenship of Principal Parties **(Diversity Cases Only)**
     Plaintiff:- **N/A**
    Defendant:- **N/A**

JUDGE MANNING

MAGISTRATE JUDGE KEYS

IV. Origin :     **1. Original Proceeding**

V. Nature of Suit:     **850 Securities / Commodities / Exchange**

VI.Cause of Action:     **15 U.S.C. §§ 78j(b) and 78t(a)**

VII. Requested in Complaint
    Class Action: **Yes**
    Dollar Demand:
    Jury Demand: **Yes**

VIII. This case **IS NOT** a refiling of a previously dismissed case.

Signature:

Date: 2/18/04

If any of this information is incorrect, please go back to the Civil Cover Sheet Input form using the *Back* button in your browser and change it.
Once correct, print this form, sign and date it and submit it with your new civil action. **Note: You may need to adjust the font size**

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

In the Matter of

**KENNETH MOZINGO,**

v.

**CONRAD N. BLACK, et al.,**

Case Number: **04C 1276**

FEB 1 9 2004

APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

Kenneth Mozingo, individually and on behalf of all others similarly situated, Plaintiff

JUDGE MANNING

MAGISTRATE JUDGE KEYS

| (A) | (B) |
|---|---|
| SIGNATURE *Marc A. Topaz / MVT* | SIGNATURE *Marvin A. Miller / MVT* |
| NAME Marc A. Topaz | NAME Marvin A. Miller |
| FIRM Schiffrin & Barroway, LLP | FIRM Miller Faucher and Cafferty LLP |
| STREET ADDRESS Three Bala Plaza East, Suite 400 | STREET ADDRESS 30 North LaSalle Street, Suite 3200 |
| CITY/STATE/ZIP Bala Cynwyd, Pennsylvania 19004 | CITY/STATE/ZIP Chicago, Illinois 60602 |
| TELEPHONE NUMBER (610) 667-7706    FAX NUMBER | TELEPHONE NUMBER (312) 782-4880    FAX NUMBER 782-4485 |
| E-MAIL ADDRESS | E-MAIL ADDRESS mmiller@millerfaucher.com |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 01916769 |
| MEMBER OF TRIAL BAR?    YES ☐    NO ☐ | MEMBER OF TRIAL BAR?    YES X    NO ☐ |
| TRIAL ATTORNEY?    YES ☐    NO ☐ | TRIAL ATTORNEY?    YES X    NO ☐ |
| | DESIGNATED AS LOCAL COUNSEL?    YES X    NO ☐ |

| (C) | (D) |
|---|---|
| SIGNATURE *Richard A. Maniskas / MVT* | SIGNATURE *Jennifer W. Sprengel / MVT* |
| NAME Richard A. Maniskas | NAME Jennifer W. Sprengel |
| FIRM Same as (A) | FIRM Same as (B) |
| STREET ADDRESS | STREET ADDRESS |
| CITY/STATE/ZIP | CITY/STATE/ZIP |
| TELEPHONE NUMBER    FAX NUMBER | TELEPHONE NUMBER    FAX NUMBER |
| E-MAIL ADDRESS | E-MAIL ADDRESS jsprengel@millerfaucher.com |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 06204446 |
| MEMBER OF TRIAL BAR?    YES ☐    NO ☐ | MEMBER OF TRIAL BAR?    YES ☐    NO ☐ |
| TRIAL ATTORNEY?    YES ☐    NO ☐ | TRIAL ATTORNEY?    YES ☐    NO ☐ |
| DESIGNATED AS LOCAL COUNSEL?    YES ☐    NO ☐ | DESIGNATED AS LOCAL COUNSEL?    YES ☐    NO ☐ |

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

In the Matter of

**KENNETH MOZINGO,**

v.

**CONRAD N. BLACK, et al.**

Case Number: **04C 1276**

DOCKETED
FEB 1 9 2004

JUDGE MANNING

APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

Kenneth Mozingo, individually and on behalf of all others similarly situated, Plaintiff

MAGISTRATE JUDGE KEYS

| (E) | (F) |
|---|---|
| SIGNATURE *Samuel H. Rudman / MVT* | SIGNATURE *Matth E VTine* |
| NAME Samuel H. Rudman | NAME Matthew E. Van Tine |
| FIRM Cauley Geller Bowman & Rudman LLP | FIRM Same as (B) |
| STREET ADDRESS 200 Broadhollow Road, Suite 406 | STREET ADDRESS |
| CITY/STATE/ZIP Melville, New York 11747 | CITY/STATE/ZIP |
| TELEPHONE NUMBER (631) 367-7100   FAX NUMBER | TELEPHONE NUMBER   FAX NUMBER |
| E-MAIL ADDRESS | E-MAIL ADDRESS mvantine@millerfaucher.com |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 06186180 |
| MEMBER OF TRIAL BAR?   YES ☐ NO ☐ | MEMBER OF TRIAL BAR?   YES ☒ NO ☐ |
| TRIAL ATTORNEY?   YES ☐ NO ☐ | TRIAL ATTORNEY?   YES ☒ NO ☐ |
|  | DESIGNATED AS LOCAL COUNSEL?   YES ☒ NO ☐ |
| (G) | (H) |
| SIGNATURE *David A. Rosenfeld / MVT* | SIGNATURE |
| NAME David A. Rosenfeld | NAME |
| FIRM Same as (E) | FIRM |
| STREET ADDRESS | STREET ADDRESS |
| CITY/STATE/ZIP | CITY/STATE/ZIP |
| TELEPHONE NUMBER   FAX NUMBER | TELEPHONE NUMBER   FAX NUMBER |
| E-MAIL ADDRESS | E-MAIL ADDRESS |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) |
| MEMBER OF TRIAL BAR?   YES ☐ NO ☐ | MEMBER OF TRIAL BAR?   YES ☐ NO ☐ |
| TRIAL ATTORNEY?   YES ☐ NO ☐ | TRIAL ATTORNEY?   YES ☐ NO ☐ |
| DESIGNATED AS LOCAL COUNSEL?   YES ☐ NO ☐ | DESIGNATED AS LOCAL COUNSEL?   YES ☐ NO ☐ |